UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RHONDA LUCAS,

               Plaintiff,                               Civil Action No. 23-cv-10953

v.

                                               HON. MARK A. GOLDSMITH

HENRY FORD HEALTH SYSTEM,

               Defendant.

_____/

## OPINION AND ORDER GRANTING HENRY FORD HEALTH SYSTEM'S MOTION FOR SUMMARY JUDGMENT (Dkt. 30)

After being terminated by Defendant Henry Ford Health System, Plaintiff Rhonda Lucas filed this lawsuit alleging discrimination and retaliation on the basis of race, age, and disability in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq.; and the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq.  Lucas also alleges interference and retaliation in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq.  See Compl. (Dkt. 1)

Before the Court is Henry Ford's motion for summary judgment on all counts (Dkt. 30). For the reasons that follow, the Court grants Henry Ford's motion.[1]

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  In addition to the motion, the briefing includes Lucas's Response (Dkt. 31) and Henry Ford's Reply (Dkt. 32).

## I.   BACKGROUND

Lucas is a sixty-two-year-old Black woman who worked at Henry Ford in various roles and at multiple campuses[2] starting in 1999 until her termination on February 23, 2022.  Lucas Dep. at PageID.1121, 1344 (Dkt. 30–2); 1999 Employment Letter at PageID.1850 (Dkt.31-1); Feb. 2022 Termination Letter at PageID.1787 (30-9).  Lucas began her employment with Henry Ford in 1999 as a contingent employee.  At Henry Ford, "contingent employees" do not have a set work schedule.  Lucas Dep. at PageID.1100.  Contingent employees can request to work open shifts and hospital supervisors can contact contingent employees to work when there are staffing shortages due to weekends, holidays, or vacations.  Ross Dep. at PageID.1434 (Dkt. 30-5).  Lucas was a contingent employee at Henry Ford until 2011.  Lucas Dep. at PageID.1102.

### A.  Henry Ford West Bloomfield

In 2011, Lucas started work in a full-time position as a social worker in the emergency department at Henry Ford West Bloomfield.  Lucas Dep. at PageID.1102–1103; Oct. 2011 Employment Letter at PageID.1852 (Dkt.31-2).

In 2015, during her time at Henry Ford West Bloomfield, Lucas was involved in a car accident, and she was off work for almost two years.  Lucas Dep. at PageID.1103.  Lucas took FMLA leave for the first three months of this two-year period.  Id. at PageID.1103–1104.  For the remainder of the time, she was not on FMLA leave.  Id. at 1104.  Lucas later testified in her deposition that she received a letter from Henry Ford's human resources department that stated that she could maintain her seniority while not working, so long as she applied and was selected for a position at Henry Ford within two years.  Id. at PageID.1103–1104, 1326.

---

[2] The Henry Ford campuses relevant to this case are Henry Ford West Bloomfield, Henry Ford Macomb, and Henry Ford Detroit.

**B. Henry Ford Macomb**

In December 2016, Lucas applied and was selected for a role as a contingent social worker at Henry Ford Macomb.[3]  Id. at PageID.1104–1105.  About eight months into this job, Lucas took a full-time social worker position at Henry Ford Macomb.  Id. at PageID.1111.  Lucas worked in this position until August of 2021.  Id. at PageID.1104–1105, 1111.

In October 2020, Lucas's supervisor, Robert Blender, resigned from his role.  Human Resources Investigation Report at PageID.1860 (Dkt.31-4).  Because Lucas had been interested in a supervisory role, Lucas emailed Stephanie Gibson, the Director of Behavioral Services, who had taken over supervision of Lucas's department, and the Director of Staff Elena Hunt, to express interest in applying for Blender's recently vacated position.  Id.; Compl. ¶ 18; Feb. 2021 Complaint at PageID.1856 (Dkt. 31-3).

Lucas and Gibson then spoke about potential supervisory opportunities within the department.  Human Resources Investigation Report at PageID.1860.  During their conversation, Gibson provided Lucas with the job description for the "supervisor of social work" position, and they discussed the position's salary range.  Id.  But when Henry Ford eventually posted Blender's vacant position, the position was not posted as "supervisor of social work."  Instead, Henry Ford created a new position, called "manager of safety and reliability."  Id.  Lucas was not qualified for the "manager of safety and reliability" role.  Id. at PageID.1861.

Lucas believed that Henry Ford created the "manager of safety and reliability" role to prevent her from advancing to a supervisory position.  Id. at PageID.1861.  As a result, on February 8, 2021, Lucas formally complained to Henry Ford's human resources department, alleging that

---

[3] Lucas's selection for this role occurred within the two-year period that she mentioned in her deposition.  Lucas Dep. at PageID.1103–1104.  The Court is unclear whether she kept her seniority, however, because the issue was not raised in the record.

Henry Ford discriminated against her and "overlooked" her for Blender's former position. Feb. 2021 Complaint at PageID.1856–1857.

Henry Ford investigated the complaint, during which it interviewed Lucas twice.[4] Lucas Dep. at PageID.1382, 1387. During these interviews, Lucas made five additional allegations that were not included in her initial complaint regarding incidents that occurred at Henry Ford Macomb earlier in 2020. See Human Resources Investigation Report. They were the following: (i) Henry Ford "had never had an African American in leadership," which Lucas felt was workplace discrimination, id. at PageID.1861; (ii) three individuals within her department were given recent promotion opportunities that she was not given, id. at PageID.1862–1863; (iii) Lucas was retaliated against in June 2020 after raising concerns to her leadership about the improper use of Personal Protective Equipment (PPE) within her department, id. at PageID.1863; (iv) Henry Ford discriminated against Lucas by including in her employee file documentation of a disciplinary action that it later decided not to pursue,[5] id. at PageID.1863–1864; and (v) Gibson "treated her differently" by "singl[ing her] out, treat[ing her] rudely, and embarrass[ing]" her on multiple occasions. Id. On one of those occasions, Lucas alleged that Gibson chastised her in front of a co-worker for working 16-hour days. Id. at PageID.1864–1865.

---

[4] Henry Ford also interviewed eight others during the investigation. Human Resources Investigation Report at PageID.1859.

[5] According to Lucas, this incident and the PPE incident are related. Human Resources Investigation Report at PageID.1864. The PPE incident occurred in June 2020. Id. In August 2020, Lucas received a "Documented Counseling" "corrective action" (neither term is defined by the parties) because she allegedly included "a statement in a patient's chart that did not pertain to patient care and appeared to emanate from interpersonal animosity." Id. at PageID.1863. Lucas argues that Bender, her supervisor at the time, should have interviewed her to get her side of the story before issuing discipline, but he did not. Id. The corrective action was later dropped, but Gibson wrote a memorandum documenting the incident and this memorandum remained in Lucas's file. Id. at PageID.1863–1864.

After completing its investigation, Henry Ford wrote an "Investigation Report," which set forth all of Lucas's concerns and provided "findings" associated with each. See Human Resources Investigation Report.  Ultimately, Henry Ford found no evidence of discrimination or retaliation in relation to any of Lucas's complaints. Id. at PageID.1865.  The Investigation Report provided Henry Ford with five recommendations for improvement related to Lucas's complaints, but none had anything to do with unlawful employment practices. Id. at PageID.1865–1866.  For example, the Investigation Report found that, during the five years preceding the investigation, there had "been no minorities in leadership" so the Investigation Report recommended greater outreach to diversify the applicant pool for future leadership openings. Id. at PageID.1861.  The Investigation Report also recommended that Lucas's supervisors conduct discussions about Lucas's personal concerns in a private setting and not in front of other coworkers. Id. at PageID.1866.

Lucas did not contemporaneously file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) related to the incidents detailed in her February 8, 2021 complaint or in Henry Ford's Investigation Report.  Lucas Dep. at PageID.1355–1356 (stating that the charge of discrimination that Lucas later filed with the EEOC on September 29, 2022 was her only charge of discrimination).

### C.  Henry Ford Detroit

In July 2021, Lucas applied and was selected for a position as a supervisor of social work case management at Henry Ford Detroit. Id. at PageID.1108; Jul. 2021 Employment Letter at PageID.1868 (Dkt. 31-5).  The position was salaried, and Henry Ford expected Lucas to work 40-hour weeks.  Ross Dep. at PageID.1439.  Lucas's transfer from Henry Ford Macomb to Henry Ford Detroit occurred on August 15, 2021.  Lucas Dep. at PageID.1108; Jul. 2021 Employment Letter at PageID.1868.

### 1.   From Orientation to October 21, 2021 Termination

Lucas began orientation when she started at Henry Ford Detroit.   Ross Dep. at PageID.1437, 1488; Gergely Dep. at PageID.1615 (Dkt. 30-6).  Lucas received a binder containing tasks that she needed to learn how to complete during orientation.  Lucas Dep. at PageID.1360; Ross Dep. at PageID.1499–1500; Gergely Dep. at PageID.1725–1726.   She also met with employees in her department, and they provided tutorials on how to complete her new tasks.  Lucas Dep. at PageID.1166, 1169, 1362, 1370.   Later, at her deposition, Lucas stated that she had not been trained properly and that she had told LaQuinta Evans, an employee in Henry Ford's human resources department, about the lack of training.   Lucas Dep. at PageID.1347, 1349.   During orientation, however, Lucas did not raise her concerns about inadequate training with her supervisor, Phina Ross, or with the main individual responsible for her training, Joe Ann Gergely.  Ross Dep. at PageID.1440, 1426, 1436; Gergely Dep. at PageID.1646, 1575.

Not long into Lucas's tenure at Henry Ford Detroit, Ross and Gergely noticed that Lucas was having "difficulties" with her leadership responsibilities and her day-to-day tasks.  Ross Dep. at PageID.1456, 1486–1487; Gergely Dep. at PageID.1736–1737.  One of the indicators that Lucas was having "difficulties" occurred about two weeks into the job, when Ross noticed that Lucas was approving patient chart documentation at 8:00 or 9:00 p.m., when her shift had ended at 4:30 or 5:00 p.m.   Ross Dep. at PageID.1440–1441.   Additionally, Ross noted that Lucas's documentation was incomplete.  Id. at PageID.1497.   Incomplete and late documentation was problematic because the other members of Lucas's team would not be aware of what was going on with a patient during their shift.  Id.  When Ross asked Lucas why she was working so late, Lucas explained that she was "trying to get things done."  Ross Dep. at PageID.1484.  Working

late was an indication to Ross that Lucas was not understanding the duties and responsibilities necessary for her new role.  Ross Dep. at PageID.1485.

Lucas's inability to correctly complete the necessary documentation led to concerns that Lucas would have trouble supervising other case managers, who also had documenting responsibilities.  Id. at PageID.1497–1498.  Lucas had been trained on documenting—she testified in her deposition that she knew how to document because it was a task she completed in her previous job with Henry Ford.  Lucas Dep. at PageID.1366.  Additionally, Henry Ford policy outlined how to properly document, and this policy was available to Lucas during her orientation. Ross Dep. at PageID.1498–1499.

Lucas also was having trouble with a core duty of her new job—scheduling assignments. Ross Dep. at PageID.1493; Gergely Dep. at PageID.1665–1666.  Lucas was responsible for creating the "daily census," which is used to make sure all positions are staffed correctly and notes any staff that are off work.  Id. at PageID.1665–1666.  Gergely explained in her deposition that this duty ensures that "[n]othing is left uncovered, and no one case manager is either expected to staff both hospital towers, or [cover] double the patients of somebody else."  Id. at PageID.1665. Lucas was not performing this task to her supervisors' expectations, which left "patients…lingering [who] need some sort of case management assistance."  Id. at PageID.1666.

Ross and Gergely spoke with Lucas about their concerns regarding her working late.  Ross Dep. at PageID.1448; Gergely Dep. at PageID.1449.  Ross spoke with Lucas one time about working late and work/life balance.  Ross Dep. at PageID.1448.  Gergely had conversations "a couple of times" with Lucas about how there was no expectation for Lucas to work so late.  Gergely Dep. at PageID.1630.  These conversations were not centered on Lucas violating any rule; it was more about Lucas having job satisfaction.  Gergely Dep. at PageID.1629–1633.  Gergely also

stated that she had "more than two" coaching conversations with Lucas regarding "areas for improvement" during her time at Henry Ford Detroit.  Gergely Dep. at PageID.1597–1598.

Despite appearing to be struggling, Lucas never told Ross that she was having difficulties with a particular task, nor did she say anything to Gergely about her reasons for struggling such that Gergely could have helped Lucas correct her mistakes.  Ross Dep. at PageID.1486–1487; Gergely Dep. at PageID.1667.  Lucas never complained to Ross and Gergely about the work or inadequate training.  Ross Dep. at PageID.1458; Gergely Dep. at PageID.1669.  In fact, when Ross asked Lucas how orientation was going and if she had suggestions on how to improve orientation, Lucas did not provide any feedback.  Ross Dep. at PageID.1458.

### 2.   From October 21, 2021 Termination to October 28, 2021 Reinstatement

On October 21, 2021, Ross and Gergely terminated Lucas for poor performance.  Oct. 2021 Termination Letter at PageID.1782–1783 (Dkt. 30-7); Lucas Dep. at PageID.1159; Ross Dep. at PageID.1458.  Ross and Gergely presented Lucas with a memorandum explaining the reasons for her termination.  Oct. 2021 Termination Letter at PageID.1782–1783.  The subject of the memorandum was "Supervisor Termination Within the Introductory Period Memo."  Id.  The body of the memorandum explained the reasons why Lucas was terminated, stating that Lucas: (i) was unable to complete the work of the day within her scheduled 8–hour shift; (ii) remained unable to meet documentation guidelines resulting in missed, delayed, and incomplete documentation; (iii) did not make adequate use of the resources available to her, including the orientation binder; and (iv) was unable to complete the daily and weekend staffing assignments, the "daily census," independently without errors or omissions.  Id. at PageID.1782.

Ross and Gergely terminated Lucas under Henry Ford's "introductory period" of employment, which is the first 90-days of employment.  Ross Dep. at PageID.1456; Gergely Dep.

at PageID.1654–1655.  Ross and Gergely believed Lucas to be within the first 90-days of her supervisory role at Henry Ford Detroit which, they thought, meant that the "introductory period" applied to her.  Ross Dep. at PageID.1456–1457; Gergely Dep. at PageID.1654.

They later learned that the introductory period did not apply to Lucas.  The same week that Lucas was terminated, the human resources department at Henry Ford alerted Ross that she could not fire Lucas under the "introductory period" because the policy only applied to new hires and not to transfers.  Ross Dep. at PageID.1459; Gergely Dep. at PageID1654.  Lucas also contacted Henry Ford's human resources department by phone that week and spoke to Evans.  Lucas Dep. at PageID.1348.  Lucas and Evans discussed how the introductory period did not apply to Lucas. Id. at PageID.1347, 1349; 1185–1186.  Lucas told Evans that she thought she was being discriminated against on the basis of race and age, though she did not allege that Ross and Gergely had said anything racist or ageist directly to her.  Id. at PageID.1178; 1185–1186.  Lucas also reported to Evans that she had not been adequately trained.  Id. at PageID.1347, 1349.

Because the introductory period policy did not apply to Lucas, Henry Ford reinstated her on October 28, 2021.  Lucas Dep. at PageID.1377.  Upon her return, Lucas met with Ross, Gergely, and Evans, and they placed her on a Performance Improvement Plan (PIP).  Lucas Dep. at PageID.1377.

### 3.  Post-Reinstatement Medical Leave and February 23, 2022 Termination

After she was reinstated, Lucas worked roughly one week before she took medical leave on November 8, 2021.  Lucas Dep. at PageID.1182–1183.  Lucas took medical leave because she felt depressed, anxious, and stressed about going to work.  Lucas Dep. at PageID.1300–1301.

Pursuant to Henry Ford policy, if an employee is absent more than three consecutive workdays for a medical reason, the employee must notify their supervisor and contact New York

Life Group (NYL) to request a leave of absence.  Henry Ford Leave of Absence Policy at PageID.1790–1791 (Dkt. 30-10).  Henry Ford utilizes NYL to coordinate and make determinations regarding its employees' eligibility for leave.  Id. at PageID.1791.  Henry Ford's leave policy requires that all requests for medical leave and leave extensions be submitted to and approved by NYL.  Id.

NYL requires employees to provide appropriate documentation so that NYL can evaluate all such requests.  Id.  NYL and/or Henry Ford may also require an employee to report periodically on the employee's status and intent to return to work.  Id.  Henry Ford's leave policy states: "[f]ailure to follow the policies and procedures of NYL and Henry Ford Health may result in denial of the request for leave and/or disciplinary action up to and including termination.  Being absent from work on an unauthorized leave, may result in corrective action up to and including termination."  Id.  The policy also explains that, unless an employee's leave period qualifies for FMLA coverage, an employee's job is not protected while on medical leave.  Id. at PageID.1792.  Additionally, not all medical leave qualifies for FMLA coverage.  Id. at PageID.1793–1795.

Lucas applied for leave through NYL.  Acknowledgement of Request for Leave Eligibility Notice at PageID.1913 (Dkt. 31-10).  After applying through NYL, Lucas received a letter from NYL informing her that she was eligible for short-term disability and company medical leave, but that she was ineligible for FMLA leave because she had not been in a continual service status for a minimum of twelve months.  Id.  Lucas elected to use short-term disability instead of company medical leave.  Feb. 17 Letter at PageID.1814 (Dkt.30-13).

While out on short-term disability leave, Lucas began treatment with a mental health professional and was diagnosed with anxiety and depression.  Lucas Dep. at PageID.1245.  During

her medical leave, Lucas regularly attended therapy and was also prescribed medications for these conditions.  Id. at PageID.1245, 1389.

During Lucas's short-term disability leave, Ross and Gergely had no contact with her, and Ross did not know the reason that Lucas was on leave.[6]  Ross Dep. at PageID.1464, 1507; Gergely Dep. at PageID.1687.  The only information Ross received about Lucas's short-term disability leave was through a letter from NYL that contained no information about the reason Lucas was on leave; it only stated the date that Lucas was expected to return to work.  Ross Dep. at PageID.1462.  Lucas was not replaced during her leave; Ross, Gergely, and others in the department shared Lucas's job responsibilities.  Ross Dep. at PageID.1464; Gergely Dep. at PageID.1693.

In December 2021, NYL began contacting Lucas to request additional documentation from her medical providers about her condition to continue her short-term disability.  Jan. 6 Letter at PageID.1810 (Dkt. 30-11).  After receiving additional information from Lucas's medical provider, NYL granted Lucas's request to extend her short-term disability leave, making the end date January 29, 2022.  Lucas Dep. at PageID.1305.

After January 29, 2022, Lucas did not return to work nor did she contact anyone at Henry Ford regarding her whereabouts.  Lucas Dep. at PageID.1315.  NYL sent Lucas letters on February 4 and February 17, 2022 requesting information from Lucas and/or her medical providers in order to extend her short-term disability claim.  Feb. 4 Letter at PageID.1812; Feb. 17 Letter at PageID.1814 .[7]

_____

[6] Gergely was not asked during her deposition whether she knew why Lucas was on medical leave.

[7] It is unclear from the record what NYL's procedures are when an employee's leave has ended. For example, it is unclear why NYL continued to send Lucas letters requesting additional documentation after January 29, 2022, the day her leave was supposed to end, and if it always initiates such requests with individuals on leave.  There is no discussion in the record about this— only that Lucas's leave ended on January 29, 2022, she didn't return to work, and NYL continued

It is unclear from the record what Lucas did when she received the February 4, 2022 letter because she provided vague and inconsistent responses to questions regarding the letters she received from NYL in her deposition.  In her deposition Lucas testified that after she received the February 4, 2022 letter, she called her medical provider, who assured her that it had sent the applicable records to NYL.  Lucas Dep. at PageID.1307.  But then later in the deposition, and at least twice in response to questions about what she did after receiving the February 17, 2022 letter, Lucas stated that she did not want to pursue the claim further, so she did nothing.  Id. at PageID.1308; 1313.  Still later in the deposition, Lucas acknowledged that she received the letters and understood what information NYL sought.  Lucas Dep. at PageID.1305–1306 (confirming she received and understood the February 4, 2022 letter); PageID.1306–1308 (confirming that she received and understood the February 17, 2022 letter).

Lucas also testified that, upon receipt of the February 17, 2022 letter, she understood that her short-term disability leave had expired and that additional leave periods would require approval from NYL.  Lucas Dep. at PageID.1313, 1317.  Despite this knowledge, she made no attempts to call NYL, her medical provider, or to appeal NYL's determination to close her short-term disability claim.  Id. at PageID.1308, 1311–1313, 1315, 1317.  Lucas also made no attempts to reach out to anyone at Henry Ford to arrange for her return to work.  Id. at PageID.1315.  Instead, Lucas simply did not return to work.  Id.

Meanwhile, after Lucas had not returned to work on January 29, 2022, Ross contacted NYL four times to see if Lucas's leave had been extended.  Ross Dep. at PageID.1462–1464.  Ross learned that NYL had not extended Lucas's leave beyond its January 29, 2022 expiration.  Id.  Ross and Henry Ford's human resources department waited approximately another month before taking

---

to send her letters warning that if it did not receive additional information from her, her claim would be closed.

any action because sometimes there was a delay with NYL receiving, processing, and then sharing information about leave decisions with Henry Ford; they wanted to make sure that Lucas's leave had not been extended again.  Id. at PageID.1467.

Finally, after not hearing anything from NYL or from Lucas for nearly a month, Ross and Henry Ford's human resources department terminated Lucas on February 23, 2022, for failing to return to work from leave in violation of Henry Ford's leave policy.  Feb. 2022 Termination Letter at PageID.1787; Ross Dep. at PageID.1465, 1508.  According to Ross and Gergely, Lucas's termination in February had nothing to do with her job performance.  Ross Dep. at PageID.1469; Gergely Dep. at PageID.1623.  At the time, Ross had no knowledge about whether Lucas was medically approved to return to work.  Ross Dep. at PageID.1507.

### 4.  Events after Lucas's February 23, 2022 termination

Lucas's position was eventually filled by Melissa Rossello in September of 2023.  Ross Dep. at PageID.1469–1470.  Ross, Gergely, and Elizabeth Robertson, another supervisor performed Lucas's duties from February 2022, when Lucas was terminated, until September 2023, when Rossello onboarded, a year and a half later.  Ross Dep. at PageID.1470; Gergely Dep. at PageID.1578.

Lucas filed a charge of discrimination based on race, age, disability, and retaliation with the EEOC on September 29, 2022.  Charge of Discrimination at PageID.1785 (Dkt. 30-8); Lucas Dep. at PageID.1355–1356.  As discussed above, this was the only charge of discrimination she has ever filed with the EEOC.  Id.[8]

---

[8] There is no information in the record that Lucas filed a charge of discrimination with the state of Michigan, either.

13

## II.   ANALYSIS[9]

Lucas brought this action alleging four counts of unlawful employment practices regarding the events described in section I.  See Compl.  In Count I, Lucas alleges FMLA interference and retaliation when Henry Ford terminated her on February 23, 2022.  Id. at ¶¶ 42–58.  In Count II, Lucas alleges discrimination and retaliation in violation of the ADA also when Henry Ford terminated her on February 23, 2022.  Id. at ¶¶ 59–76.  In Count III, Lucas alleges race discrimination and retaliation in violation of Title VII when Henry Ford disciplined her in August 2020, denied her a promotion opportunity in October 2020, when she filed a complaint of workplace discrimination in February 2021, when Henry Ford attempted to terminate her in October 2021, and when Henry Ford terminated her in February 2022.  Id. at ¶¶ 77–103.  Lastly, in Count IV, Lucas alleges age discrimination and retaliation in violation of the ADEA when she was denied the opportunity to promote in October 2020, when she filed a complaint of discrimination at Henry Ford in February 2021, when Henry Ford tried to terminate her in October 2021, and when Henry Ford terminated her in February 2022.  Id. at ¶¶ 104–126.

### A.  Time-Barred Title VII and ADEA Claims

As a threshold matter, Henry Ford argues that certain of Lucas's claims are untimely.  Mot. at PageID.1055–1058.  The Court agrees.  To bring a suit under Title VII or the ADEA, an employee must first file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment practice or, if the plaintiff has instituted proceedings with a state or local

---

[9] The Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007).  The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can only survive summary judgment by coming forward with evidence showing there is a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

agency, within 300 days of the alleged unlawful employment practice.  See 42 U.S.C. § 2000e–5(e)(1); see also 29 U.S.C. § 626(d)(1).  If the EEOC dismisses the charge and issues a right-to-sue letter, the plaintiff has 90 days to file a civil action.  See 42 U.S.C. § 2000e–5(f)(1); 29 U.S.C. § 626(e).

"Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice," within the meaning of the charge filing requirement of Title VII and the ADEA.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002) (citing 42 U.S.C. § 2000e–5(e)(1)).  Discrete discriminatory acts include: termination, failure to promote, denial of a transfer, or refusal to hire.  Morgan, 536 U.S. at 114.  "Each discrete discriminatory act starts a new clock" for a plaintiff to file charges alleging discrimination related to that act.  Id. at 113.  Thus, the plaintiff must file an EEOC charge within the applicable 180-day or 300-day time period after the discrete discriminatory act occurred.  Id.  Discrete discriminatory acts are not actionable if time-barred, even if they are related to acts alleged in timely filed charges.  Id.  While time-barred acts are not actionable, an employee may use the prior acts as background evidence in support of a timely claim.  Id.  These same principles apply to the ADEA.  Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985) ("This interpretation of Title VII...applies with equal force in the context of age discrimination, for the substantive provisions of the ADEA were derived in haec verba from Title VII.") (punctuation modified).

As discussed above, Lucas filed her first and only EEOC charge on September 29, 2022. Charge of Discrimination at PageID.1785; Lucas Dep. at PageID.1355–1356.  It follows that claims related to events that occurred before December 3, 2021 are time-barred.[10]  Mot. at

---

[10] It is unclear why Henry Ford argues that the 300-day limitation period applies in this case instead of the 180-day limitation period.  There is no indication in the record that Lucas filed a complaint

PageID.1056; See 42 U.S.C. § 2000e–5(e); 29 U.S.C. § 626(d)(1).  Accordingly, Lucas's Title VII and ADEA claims related to two events in 2020 and two events in 2021—all of which occurred well-before the applicable time period—are time-barred.  The only alleged unlawful employment practices under Title VII and the ADEA in Lucas's complaint that survive are those related to Lucas's February 23, 2022 termination.[11]  Id.

Lucas argues that the "continuous violation" doctrine tolls the timely filing requirements as to her October 21, 2021 attempted termination, only.[12]  Resp. to Mot. at PageID.1833–1834. The Court disagrees.  There are certain circumstances where the time period for filing a charge with the EEOC may be subject to equitable tolling.  Morgan, 536 U.S. at 113.  For example, the continuing-violations theory is a specific equitable doctrine that tolls Title VII's filing period. Kovacevich v. Kent State Univ., 224 F.3d 806, 829 (6th Cir. 2000).  But this doctrine only applies to certain employment claims, like hostile work environment claims, Morgan, 536 U.S. at 115, and when discrete discriminatory acts are part of a "longstanding and demonstrable policy of discrimination."  See Sharpe v. Cureton, 319 F.3d 259, 268 (6th Cir. 2003).

_____

with a "state or local agency with authority to grant or seek relief" from an unlawful employment practice, 42 U.S.C. § 2000e-5(e)(1), so it is not apparent that the 300-day limitation applies.  If Henry Ford were to have argued that the 180-day limitation period applied, none of Lucas's alleged unlawful employment claims would have been within the 180-day limitation period, as they all occurred more than 180 days before September 29, 2022, i.e., before April 2, 2022.

[11] As set forth above, Lucas's FMLA and ADA claims relate only to her February 23, 2022 termination, and not to earlier events.  See Compl.  Therefore, the time-bar analysis does not apply to these claims.

[12] Lucas does not make any arguments in her response related to the other alleged unlawful employment practices that she alleges in her complaint—i.e., being disciplined in August of 2020 and failing to be promoted in October of 2020.  As such, she has forfeited any argument that these claims should survive summary judgment.  See Briggs v. Univ. of Detroit-Mercy, 22 F. Supp. 3d 798, 811 (E.D. Mich. 2014), aff'd, 611 F. App'x 865 (6th Cir. 2015) ("If a party fails to respond to an argument raised in a motion the court can assume that opposition to the motion is waived and the motion may be granted.") (punctuation modified).

The continuing violation doctrine does not save Lucas's claims with respect to her October 21, 2021 attempted termination.  First, Lucas has not alleged that she was subjected to a hostile work environment.  <u>See</u> Compl.  Second, Lucas has not established that the October 21, 2021 attempted termination, as a discrete discriminatory act, was part of a "longstanding and demonstrable policy of discrimination."  <u>Sharpe</u>, 319 F.3d at 269.  To establish that her October 21, 2021 attempted termination was part of a "longstanding and demonstrable policy of discrimination," Lucas must establish by a preponderance of the evidence that "some form of intentional discrimination against the class of which plaintiff was a member was the company's standing operating procedure."  <u>Id.</u> (punctuation modified).  Lucas has made no attempts to make this showing.  <u>See</u> Resp.

Accordingly, Lucas's Title VII and ADEA claims relating to unlawful employment practices that occurred before December 3, 2021 are time-barred.  This leaves Lucas with only one remaining alleged unlawful employment event from which she can bring her Title VII and ADEA claims: her February 23, 2022 termination.

**B.  Claims Related to the February 23, 2022 Termination**

Lucas's remaining claims are FMLA, Title VII, ADEA, and ADA related to her 2022 termination.  For the reasons discussed below, none survives summary judgment.

A plaintiff can support discrimination and retaliation claims under the FMLA, Title VII, ADEA, and ADA by either direct or indirect evidence.  <u>Brown v. Kelsey-Hayes Co.</u>, 814 F. App'x 72, 79 (6th Cir. 2020); <u>Demyanovich v. Cadon Plating & Coatings, L.L.C.</u>, 747 F.3d 419, 427 (6th Cir. 2014) (identifying that the <u>McDonnell Douglas</u> framework applies in the context of FMLA claims).  Because Lucas has not pointed to any direct evidence of discrimination or retaliation related to her 2022 termination, the Court examines her claims under the burden-shifting

framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Lucas Dep. at PageID.1156–1158, 1162–1163, 1178.

Under the <u>McDonnell Douglas</u> framework, the employee has the initial burden of establishing her prima facie case; if she does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  <u>McDonnell Douglas</u>, 411 U.S. at 802–804.  If the employer satisfies this showing, then the burden shifts back to the employee to show that the employer's proffered reasons are pretextual.  <u>Id.</u>

### 1. FMLA

#### a. Interference

Lucas's first claim in Count I is that Henry Ford interfered with her right to take FMLA leave.  <u>See</u> Compl. at ¶¶ 42–58.  The FMLA "entitl[es]" qualifying employees up to 12 weeks of unpaid leave each year if, among other things, an employee has a "serious health condition" that prevents the employee from being able to perform her duties.[13]  <u>See</u> 29 U.S.C. § 2612(a)(1).  An employee is "eligible" under the FMLA if she has worked for the same employer for at least one full year <u>and</u> has provided at least 1250 hours of service within that period.  <u>See</u> 29 U.S.C. § 2611(2)(A) (emphasis added).  The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" that right.  <u>See</u> 29 U.S.C. § 2615(a)(1).

---

[13] The Act encourages employers to adopt their own leave policies that are more generous than the FMLA, which provides eligible employees 12–weeks of leave in a 12–month period.  <u>See</u> 29 U.S.C. § 2653 ("Nothing in this Act…shall be construed to discourage employers from adopting or retaining leave policies more generous than any policies that comply with the requirements under this Act.").  As long as an employer's leave "policies meet the Act's minimum requirements, leave taken [under the employer's policies] may be counted toward the 12 weeks guaranteed by the FMLA."  <u>Ragsdale v. Wolverine World Wide, Inc.</u>, 535 U.S. 81, 87 (2002).

"To establish a prima facie case of FMLA interference, an employee must show that: (1) he was an eligible employee; (2) the defendant was a covered employer under the FMLA; (3) he was entitled to take leave under the FMLA; (4) he notified his employer of his intent to take leave; and (5) the employer denied him benefits or rights to which he was entitled under the FMLA." Demyanovich, 747 F.3d at 427 (punctuation modified).   In order to show the fifth element, "[e]mployees seeking relief under the entitlement theory[14] must [ ] establish that the employer's violation caused them harm."   Edgar v. JAC Prods., Inc., 443 F.3d 501, 508 (6th Cir. 2006). Further, "an employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion" of their leave.  Id. at 506–507.

Henry Ford's motion argues only the fifth element of the prima facie case—that Lucas was not denied benefits or rights she was entitled to under the FMLA.  Mot. at PageID.1065–1067. First, Henry Ford argues that Lucas has not established she was harmed because she received a period of leave longer than she was due under the FMLA.  Id.  Henry Ford argues that Lucas received 15 weeks of short-term disability leave because it held her job open for her while she was on leave from November 8, 2021 to February 23, 2022, even though her actual leave period expired on January 28, 2022.  Mot. at PageID.1065.  Fifteen weeks of leave is a longer period of time than she would have received under the FMLA. [15]  Id.

---

[14] Some courts refer to the "entitlement theory" as the "interference theory."  Edgar, 443 F.3d at 507.

[15] There is some indication in Lucas's deposition and in a letter from NYL that Lucas was paid during her approved short-term disability.  Lucas Dep. at PageID.1350–1352 ("[w]hen I was on medical leave, when they approved my pay…"); Feb. 17 Letter at PageID.1814 ("[W]e are unable to continue paying benefits beyond January 29, 2022.").  Henry Ford does not mention in its briefing whether Lucas's short-term disability was paid.  If Lucas was paid during her short-term disability, she clearly received better benefits than she would have under the FMLA as FMLA leave is unpaid.  See Ragsdale, 535 U.S. at 84 (explaining that the FMLA guarantees qualified employees 12 weeks of unpaid leave each year).

Moreover, Henry Ford notes that it did not hire someone to replace her while she was on leave.  Id.; Mot. at PageID.1067; Ross Dep. at PageID.1464 (stating that Lucas's responsibilities during her leave were absorbed by Ross and Gergely); PageID.1514 (stating that she "anticipated that [Lucas] would be returning [to work.]"); Gergely Dep. at PageID.1693–1693 (stating that Lucas's duties were split amongst those who remained in the department).  The fact that Henry Ford did not replace Lucas while she was on leave is important because the FMLA entitles an eligible employee to be restored to the same or equivalent position upon returning to work.  See 29 U.S.C. § 2614(a)(1).

Additionally, as Henry Ford argues, Lucas has not demonstrated that she was able to return to work after her leave expired, which further forecloses her interference claim.  Mot. at PageID.1066; see Edgar, 443 F.3d at 506–507.  Indeed, the record demonstrates only that Lucas was unable to and did not, in fact, return, despite her testimony that she knew her leave end-date was January 29, 2022.  See Lucas Dep. at PageID.1305–1308, 1313, 1317.

Lucas does little to address each element of her prima facie case.  Instead, she argues that (i) she was entitled to FMLA leave because she had been employed by Henry Ford since 1999 and she had a serious health condition, and (ii) after she was fired, she was not given any information as to her "eligibility for job-protected leave."  Resp. at PageID.1845–1846.  She also argues that she can show "harm" because she "would have been entitled to a total of twelve workweeks of leave upon expiration of her short-term disability benefits."  Id. at PageID.1846.

None of these arguments establish the prima facie elements of her claim.  First, while Lucas has been employed at Henry Ford since 1999, that is only one half of the statute's requirement. The statute also requires that the employee work at least 1250 hours of service within the previous year.  29 U.S.C. § 2611(2)(A).  Lucas provides no evidence of her hours worked over the past year.

Therefore, Lucas has not demonstrated that she was an eligible employee.  Lucas's second argument—that she was not given any information about job protected leave after her short-term disability leave ended—is belied by the fact that she admits in her deposition to receiving the letters from NYL informing her of when her leave was to expire and what she needed to do to extend her leave.  See Lucas Dep. at PageID.1305–1308, 1313, 1317.  Lastly, Lucas's argument that after her short-term disability leave, she was entitled to an additional 12 weeks of leave under the FMLA, is wrong as a matter of law.  As the United States Supreme Court explained in Ragsdale, as long as an employer's leave "policies meet the [FMLA]'s minimum requirements, leave taken [under the employer's policies] may be counted toward the 12 weeks guaranteed by the FMLA."  535 U.S. at 87.  Lucas received at least 12-weeks of short-term disability leave and Henry Ford did not fill her position during that time.

Therefore, the Court finds that Lucas failed to set forth a prima facie case of interference under the FMLA and finds summary judgment proper with respect to Lucas's FMLA interference claim.

### b.  Retaliation

Lucas's remaining theory of recovery under Count I is her "retaliation" or "discrimination" theory arising under the FMLA.  See Compl.; Banks v. Bosch Rexroth Corp., 610 F. App'x 519, 523 (6th Cir. 2015).  To establish an FMLA retaliation claim, Lucas must demonstrate that: (i) she was engaged in an activity protected by the FMLA; (ii) the employer knew that she was exercising her rights under the FMLA; (iii) after learning of the employee's exercise of FMLA rights, the employer took an adverse employment action against her; and (iv) there was a causal connection between the protected FMLA activity and the adverse employment action.  Arban v. West Publ'g Corp., 345 F.3d 390, 404 (6th Cir. 2003).

Lucas does not make arguments related to FMLA retaliation, at all, in her response brief. See Resp. at PageID.1843–1844. She argues, generally, that she was retaliated against because of two incidents. Id. First, when she made a formal complaint of workplace discrimination on February 8, 2021, and second, after Henry Ford attempted to terminate her in October 2021. Id. at PageID.1844. But these two incidents have nothing to do with engaging in an "activity protected under the FMLA" because both incidents occurred before she took medical leave. In any event, a claim related to these incidents would be time-barred. Therefore, Lucas has failed to set forth a prima facie case of FMLA retaliation and the Court grants summary judgment to Henry Ford on Count I.

### 2. Lucas's Discrimination Claims under Title VII, ADEA, and ADA

#### a. Title VII and ADEA

Lucas combines her analysis on her Title VII and ADEA claims in her response brief so the Court will examine her arguments together. See Resp. at PageID.1836–1838.

To establish a prima facie case of discrimination under Title VII the plaintiff must show: "that he was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated nonminority employees." Tennial v. United Parcel Serv., Inc., 840 F.3d 292, 303 (6th Cir. 2016) (punctuation modified).

To prove a prima facie case of age discrimination under the ADEA, a plaintiff must show: "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a younger worker." George v. Youngstown State Univ., 966 F.3d 446, 464 (6th Cir. 2020) (punctuation modified).

Henry Ford argues that Lucas failed to demonstrate a prima facie case under Title VII and the ADEA because she cannot meet the fourth element—that she was terminated for failing to return from leave but that other similarly situated individuals outside of her protected class were not terminated for the same violation.  Mot. at PageID.1059.

Lucas disagrees.  She argues that she has provided examples of similarly situated employees who were not terminated: Laurie Golden, Kristin Felgenaur, and Melissa Rossello. Resp. at PageID.1837–1839.

As to her claim of race discrimination, Lucas establishes that Golden and Felgenaur were outside of her protected classes in that both were Caucasian.  Ross Dep. at PageID.1472, 1505– 1506.  Lucas further argues that both Golden and Felgenaur took medical leaves that were longer than hers and, unlike Lucas, they were not fired.  Resp. at PageID.1837–1838, 1842.  A closer look at the record demonstrates that neither Golden's nor Felgenaur's circumstances were similar to Lucas's.  Golden took short-term disability leave for over a year.  Ross Dep. at PageID.1472. However, after her leave, Golden did not return to work and instead she retired.  Gergely Dep. at PageID.1706.  Felgenaur, took approximately four weeks off but she returned to work on her expected return date.  Ross Dep. at PageID.1505–1506.  Thus, unlike Lucas, neither Golden nor Felengaur failed to return from leave when it expired and still retained their jobs.  Indeed, Lucas could not identify anyone at Henry Ford who, like her, failed to return to work after her leave period expired.  Lucas Dep. at PageID.1373.  Lucas has not established a prima facie case under Title VII based on Golden and Felgenaur because neither were a similarly situated employee. Tennial, 840 F.3d at 304 (finding that the comparator "need not be identical in every way in order to be a proper comparator," but the plaintiff must show that the "comparator is similarly situated

in all relevant aspects and has engaged in acts of comparable seriousness.") (punctuation modified).

As to her claim of age discrimination, Lucas argues that Melissa Rossello is a comparator. Resp. at PageID.1838. As discussed above, Rossello was hired to replace Lucas in September 2023 and was forty-seven years old, thus younger than sixty-two-year-old Lucas. Henry Ford Supplemental Interrogatories at PageID.1930 (Dkt. 31-12); Lucas Dep. at PageID.1121.

Aside from the prima facie deficiencies under the ADEA, her claim fails on the McDonnell Douglas burden shift. Henry Ford articulated a non-retaliatory reason for Lucas's termination: "her failure to return from medical leave." Mot. at PageID.1064. Lucas makes no arguments regarding pretext related to age discrimination. Resp. at PageID.1841–1842. She makes no arguments outside of those she already made in her effort to set forth her prima facie case, namely, that she was replaced by a younger worker. Id. at PageID.1837–1838. This showing is insufficient to establish pretext as a matter of law. See Tennial, 840 F.3d at 305–306 ("…the sole fact that [she] was replaced by a younger person is insufficient as a matter of law to raise a genuine dispute of material fact as to whether the [employer's] nondiscriminatory reason…was pretextual.").

In sum, Lucas failed to set forth a prima facie case for race discrimination and even assuming Lucas has set forth a prima facie case of age discrimination, Lucas has failed to meet her burden of showing that Henry Ford's reason for terminating her was pretextual. Therefore, the Court grants summary judgment to Henry Ford on Lucas's race and age discrimination claims under Counts III and IV.

### b. ADA

Lucas next argues that Henry Ford discriminated against her because of her disability in violation of the ADA when it fired her on February 23, 2022. Resp. at PageID.1838–1840. This

24

claim fares no better than Lucas's race and age discrimination claims.  To establish a prima facie case of disability discrimination, a plaintiff must show that "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." Whitfield v. Tenn., 639 F.3d 253, 258–259 (6th Cir. 2011) (punctuation modified).

An employee cannot be subject to an adverse employment action based on her disability unless the individual decisionmaker responsible for her termination had knowledge of that disability.  Nilles v. Givaudan Flavors Corp., 521 F. App'x. 364, 368 (6th Cir. 2013) (punctuation modified).  A prima facie case is not established if the decisionmaker is unaware of the specifics of an employee's disabilities or restrictions, even if the decisionmaker has a general knowledge that a disability exists.  Arthur v. Am. Showa, Inc., 625 F. App'x. 704, 708 (6th Cir. 2015).

Assuming that Lucas was able to meet the remaining prima facie elements of her ADA claim, she has failed to present proof that Ross, the individual who made the decision to terminate her, was aware of her disability.  Lucas's supervisors, Ross and Gergely, were aware that she took short-term disability leave, but there is no indication anywhere in the record that they knew that her leave was for anxiety and depression.  Tennial, 840 F.3d at 306 (finding that even though the Plaintiff's supervisors knew that he took leave, "there was no indication anywhere in the record that his supervisors knew the leave was for work related stress.").  Indeed, the record is uncontroverted that neither had any knowledge, whatsoever, about the reason for Lucas's leave. Ross Dep. at PageID.1507 (Question: "Do you have any knowledge of Ms. Lucas's medical reason for leave of absence?" Response: "No."); Gergely Dep. at PageID.1678 (Question: "…do you

know if [Lucas] was approved by her medical provider to return at the time of her termination?" Answer: "…we did not have that information…").  Therefore, Lucas has not established a prima facie case of disability discrimination, and Henry Ford is entitled to summary judgment as to this claim as well.  Accordingly, the Court grants summary judgment to Henry Ford on Lucas's ADA discrimination claim under Count II.

### 3.   Lucas's Retaliation Claims under Title VII, ADA, and ADEA

As detailed above, Lucas argues that she engaged in protected activity twice.  Resp. at PageID.1844.  Once in February 2021, when she filed a complaint against her supervisors at Henry Ford Macomb, and a second time, in October of 2021, after Henry Ford Detroit tried to terminate her.  Id.[16]  In the second episode, she alleges that she spoke to Evans by telephone about how the probationary period did not apply to her, so she believed her supervisors were discriminating against her.  Id.  Because after both of those incidents, Henry Ford tried to, or did successfully terminate her, Lucas argues that temporal proximity demonstrates that she has established a prima facie case for retaliation.  Id.  While Lucas does not specify in her response which theory of retaliation—race, age, or disability—she believes she has established, the Court finds that she has not established a prima facie case under any theory.

To set forth a prima facie showing of Title VII retaliation, "an employee must show (1) he ... engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action."  Laughlin v. City of Cleveland, 633 F. App'x 312, 315 (6th Cir. 2015) (punctuation modified).  The prima

---

[16] Both of these discrete discriminatory acts, themselves, are time-barred.  See section II.A.  But because Lucas alleges that her termination on February 23, 2022 was in retaliation for complaints, the Court addresses them in this section.

facie case is the same for the ADA and ADEA.  Rorrer v. City of Stow, 743 F.3d 1025, 1046 (6th Cir. 2014) (establishing the prima facie case for retaliation for the ADA); Fox v. Eagle Distributing Co., Inc., 510 F.3d 587, 591 (6th Cir. 2007) (establishing the prima facie case for retaliation for the ADEA).

Lucas has not established a prima facie case for any theory of retaliation.  For one, Lucas has not demonstrated that Ross, her supervisor at Henry Ford Detroit and the individual who made the decision to terminate her in October 2021 and February of 2022, knew about her complaints of discrimination at Henry Ford Macomb in February of 2021 or her phone call with Evans in October of 2021.  Scott v. Eastman Chem. Co., 275 F. App'x 466, 482 (6th Cir. 2008) ("[I]t is fairly clear from Sixth Circuit case law that employer knowledge of a plaintiff's protected activity is required."); Ross Dep. at PageID.1468 (Question: "Did Ms. Evans tell you that Ms. Lucas had complained of discrimination?" Answer: "No.").

Another strike against Lucas's prima facie case of retaliation is that she has not established but-for causation that she would not have been fired except for her two complaints of discrimination in February 2021 in October 2021.  To establish the "causal connection" element of a retaliation claim, a plaintiff must demonstrate but-for causation, that is, "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013).

The only argument Lucas makes to prove causation is temporal proximity.  Resp. at PageID.1844.  Temporal proximity alone may be enough to draw an inference of but-for causation when "an adverse employment action occurs very close in time after an employer learns of a protected activity."  Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008).  However, "where some time elapses between when the employer learns of a protected activity and

the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." Id. (punctuation modified).

Here, Lucas's first protected activity occurred in February 2021—nearly a year before her termination in February of 2022.  Resp. at PageID.1844.  And her second protected activity occurred in October 2021—four months before her termination.  Id.  These gaps between the act and the adverse employment events are too long for temporal proximity alone to suffice for a causal connection.  See Kenney v. Aspen Technologies, Inc., 965 F.3d 443, 449 (6th Cir. 2020) ("[A] roughly 75-day delay between her protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation."); Imwalle v. Reliance Med. Prods., 515 F.3d 531, 550 (6th Cir. 2008) ("In this circuit, a period of more than four months was found to be too long to support an inference of causation.") (punctuation modified).  Lucas has not put forward any other evidence beyond temporal proximity, which is inadequate.

Even assuming Lucas established temporal proximity, this inference is rebutted if there is an "intervening legitimate reason to discipline" the employee.  Wasek v. Arrow Energy Services, 682 F.3d 463, 472 (6th Cir. 2012); see also Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 401 (6th Cir. 2010) (holding that an intervening "obviously nonretaliatory basis" for the adverse action is evidence negating temporal proximity).  While Lucas's October 2021 complaint to Evans was only four months before Lucas was terminated in February 2022, there was an intervening event, Lucas's failure to return from short-term disability leave.  This is also Henry Ford's non-discriminatory reason for Lucas's termination.  Lucas does not present additional evidence that would discredit Henry Ford's non-retaliatory basis to terminate her or otherwise support the inference that she asks the Court to make.  Therefore, Lucas's claim cannot survive summary judgment.

Because Lucas cannot establish a prima facie case for retaliation under any the statutes under which she alleges retaliation, Henry Ford is entitled to summary judgment as to her retaliation claims in counts II, III, and IV.

### III.    CONCLUSION

For the reasons set forth above, the Court grants Henry Ford's motion for summary judgment and all of Lucas's claims are dismissed with prejudice.

**SO ORDERED.**

Dated: September 29, 2025                           s/Mark A. Goldsmith
Detroit, Michigan                                           MARK A. GOLDSMITH
                                                                      United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 29, 2025.

s/Joseph Heacox
JOSEPH HEACOX
Case Manager